Your Honors, it pleases the Court, it's Jack Perry from the Taft Law Firm and I'm here on behalf of the Appellant Plaintiff Protégé Biomedical, LLC. And I first want to begin by thanking you for granting oral argument. I know that's not always granted and forgiveness after 15 minutes. I know it's a privilege and hopefully I can use it well. In reviewing Judge Thunheim's dismissal under Rule 12B6 of our three claims versus, or Protégé's three claims versus both Duff & Phelps and versus Mr. Smith, by my count there are ten errors that Judge Thunheim made. Mercifully for argument here, four of those are repeat between the two sets of claims. So really six errors of law that are before you. And I want to begin with the most important one, which is Judge Thunheim dismissed the breach of contract claim versus Duff & Phelps for failure to adhere to the confidentiality clause, which he doesn't identify but is essentially paragraph 9, I believe is what he's referring to. But even though paragraph 9 of the engagement agreement specifies both a requirement obligation to keep confidential information and a requirement not to disclose, the only thing that Judge Thunheim addresses is the lack of evidence as to the failure to disclose, which is very important. The first prong under paragraph 9 is with regard to the obligation to keep confidential. Further problematic is that paragraphs 1C, 1E, 1I and paragraph 6C all explain and specify the specifics of how they were to keep confidential, i.e. they were And once we approved it, it was supposed to be signed. It was supposed to be signed by ZMedica. And they were supposed to tell us when that was done, which they did. And at that point, because they were, quote, coordinating under 1E, coordinating the distribution, end of quote, of all information, and we had no control over it and we had no ability to even see what the NDA said, we were at their mercy. And upon them telling us the NDA had been signed on January 30th, I think it's Appendix 97, we immediately had within two weeks a call wherein on February 8th, we disclosed all of our confidential information to a third party that was purportedly, according to Duff and Phelps, subject to the NDA. What transpired was that all of our confidential information was released to our number one competitor and we had to sue them and we recently settled with that. But the error of law, the first error of law is that Judge Schoenheim only looked at one half of paragraph 9 and ignored all together 1C, E, I and 6C, which required Duff and Phelps as our exclusive financial advisor to keep this information confidential for five years. Does it make a difference here that technically speaking, Duff and Phelps did keep it confidential and that Protege was the one that ultimately disclosed? Now, we can argue about what all the ultimate causes were, but just from a plain language perspective, didn't Duff and Phelps keep it confidential? No, because that's why, Your Honor, that's what Judge Schoenheim said. That's why I begin with keep it confidential. What does that mean? This engagement agreement defines it. It defines under 1C that they can't produce our confidential information to a potential purchaser until we've approved the NDA and that's why 1E says they are to coordinate the distribution of all confidential information. Coordinate distribution includes telling us, hey, this has been signed. You can now freely disclose. 1I, which may be the most important of all of it, says that they need to act consistent with what is customarily provided in this industry. What is customarily provided by financial advisors is they have an NDA signed. Similar to our situation, the parties trying to sell the product would have no idea about that NDA because it's not given to them. So we were completely, Your Honor, at their mercy. So when we disclosed it, we disclosed it at their direction consistent with 1C, E, and I. Now, I thought the NDA actually went back to Protégé and Protégé had their own lawyers review it as well. That's undisputed in the record. Am I wrong about that? No, that's true. In fact, we edited the engagement agreement and I believe we edited the NDA too. We're not objecting to the terms of it. In fact, we're just trying to enforce the terms that we had reviewed for the engagement agreement provides they shall keep it and it provides how they are going to keep it. We agreed to how they are going to keep it and they adhered to that because they did it twice. I think that if you look at Appendix 97 when they told us on January 30, hey, the NDA is in place, and then they give it to us on August 8 after all of our disclosure, but it's revealing they give it on August 8 and they again tell us that attached NDA that DW Healthcare signed on behalf of ZMedica. All the way through August, they're still telling us the same thing. This is a valid NDA. Up until August 8, we don't have a document to look at. There is no lawyer who can look at it. We don't have it. That's the first time and that's after we've already disclosed on February 8 during the telephone conversation, then on April 17 at the Tufts University when we literally give them our product to the competitor and without an NDA to take care of us. That cannot be an unprojected situation because every single small business enterprise like this one that's trying to sell puts their hand in some financial advisor. In this case, they did so with these protections. Those protections only work if they perform the threshold issue, which is to make sure the NDA applies to the party, the potential purchaser, which wasn't DW Healthcare. It was ZMedica. The first error was he focused on just the disclosure and not what the rest of the agreement provides for, which is to keep it confidential on 1C. Keep in mind, too, this is under Rule 12b-6, so we should be able to explore that. The second error is even clearer and that is he said the gross negligence breach of contract against DMP is not allowed in New York. Well, the problem is that the Mancini case says the parties can create by contract whatever standard they want. In this case, they created in part gross negligence. More importantly, the same court, the First Division, Federal Division of New York, the City of New York case, the 2000 case, decided in 2015 and 2019 that a case that is almost spectacularly similar to ours, COPASA I and COPASA II, that you can proceed on a gross negligence claim for a contract, COPASA I, 2015, says, quote, contract-based claim for gross negligence could not be dismissed. They reversed the dismissal of that based on the same reason Judge Schoonheim did. Better, on page 470 of COPASA II, the court, again, this is the Appellate Division, clarifies that there is only one claim in COPASA. It is a breach of contract claim and that claim is only for gross negligence. It says, quote, COPASA's sole cause of action is for a breach of the March 2010 engagement letter with its exclusive financial advisor. The facts of that case are very similar to ours in that they contracted with this exclusive financial advisor. They screwed up on the bid. They had an error of $82 to $84 million because they didn't figure out the bid correctly and they sued it for gross negligence and the court twice, both under Rule 12 standard and Rule 56, reversed the district court. The third error is Judge Schoonheim's reliance on the Spinelli case to say that disclaimers are binding. The problem is Spinelli goes on to say that it was ruling as it did because the disclaimer, as well as the arm's length nature of plaintiff's relationship with the Associated Press. Spinelli wasn't addressed in the situation we have here. And the highest court in New York, we cite and rely upon the Valeron case from 2015, which has three parts that are absolutely critical to your decision making. The first reliant upon what it calls the New York's highest court, which is EBC Inc. or EBC 1 Inc. versus Goldman Sachs, says where a writing erects the essential structure of an agency relationship even an explicit disclaimer cannot undo it. Valeron court went on to say that you must look past the labels and at the end it concludes that exclusive agency gives rise to fiduciary duty between principal and agent under New York law. In other words, Spinelli doesn't control because it didn't have facts like ours. And I have on page 16 of our reply brief note one, the Second Circuit recognizes that it doesn't trump state court rulings, particularly if they're the highest court. And so the Second Circuit, which is what Spinelli was, itself recognizes they have to defer to the state court even if it disagrees with it. The fourth there is the issue of principal and agent, which is bizarre to me because Judge Thunheim on page 15 recognizes that, quote, a principal-agent relationship existed between Duff and Phelps and Protégé by way of the engagement agreement, but then says it's not a principal-agent, but he does so based upon the disclaimer essentially. But the Samba Enterprises case says, quote, under New York law, an agent has fiduciary obligations to its agent. In other words, same as breach of fiduciary, New York law says that if there's a principal-agent relationship, then there is a duty. The fifth error is with regard to the unlawful practice of law against Duff and Phelps. And I think this gets back to your question about, the very initial question about, what was the duty? And that's where I think if you sit back, and maybe I've sat too long on this case, but when you sit back and look at this case, what were the parties trying to do? Well, we were at the mercy of the other side, but the contract was to protect us. Under paragraph 9, they had to keep it and under 1C, E, I, and 6C, they had to tell us when to reveal these and disclose this information. And what makes it complicated, why I raised the unlawful practice of law is that normally it wouldn't matter. Normally, the documents signed, NDAs, I mean, you do them hundreds of times for each deal. The reason it's difficult here is that they at two different times told us on January 30th and then on August 8th, they repeat it, that you have an NDA in place. Well, Judge Schoenheim earlier in the ZMedica case said, that's not true. That is wrong. That is an error of law. And we argued vigorously against that because we were suing ZMedica. He said, no, they are not on this document. You're out. We could not have known that. We were at their mercy and we were relying upon their January 30th and August 8th representation to us, which was a legal opinion, which is that ZMedica is bound. Excuse me, I wanted to reserve time. Yeah, you're well into your rebuttal. You can continue. Yeah, I know, I know. Thank you for the warning. I'm going to touch upon one more because the rest are kind of repeats. The issue I have with the Smith is, of course, you all know we have the fraud and joy understand it, so they have a much heavier burden. My frustration is under the low, low factors is the court, Judge Schoenheim, recognized low, low applies and then he essentially addresses the factual issues under the five factors and does short shrift of each of those five. And I'll address that more on rebuttal. Thank you very much. Very well. Good morning, Your Honors, and may it please the Court. This is ultimately a contract case and the contract just doesn't support the plaintiff's theory. There was a confidentiality provision in this contract and it just required Duff to not disclose confidential information itself. Duff didn't violate that provision. There is no provision in this contract charging Duff with ensuring that there's a legally binding NDA in place before protege disclosed its own confidential information. This contract mentions an NDA only one time and only in paragraph 1C. That paragraph says only that Duff will give buyers the confidential information memorandum under an NDA approved by protege. And that never happened here. We never got to that point. There was no confidential information memorandum prepared by Duff and disclosed to ZMedica. What paragraph 1C doesn't do is to charge Duff with ensuring that there is a legally binding NDA in place before protege itself disclosed its trade secrets. And in the end, protege itself took responsibility for that when the parties got on the phone at the February conversation in which protege says it disclosed all its trade secrets. Protege itself confirmed on that call, quote, we're all under an NDA. No one did that because they were told that by a representative of Duff? They believed that. Well, first of all, they believed that because there was an NDA signed by someone who everyone thought was representing the buyer, ZMedica. And it was very clear always who the buyer was. The buyer was always going to be ZMedica. The communication that protege refers to here is an email from a non-lawyer that says, quote, we have a signed non-disclosure in place with DW Healthcare slash ZMedica. Well, to me that raises a question. Does it bind both? Why do we think so? It's ambiguous. Well, is it really ambiguous or is it saying it's signed by both? And can you rely on that? Well, I think the question here is what does the contract... It's 12B6. I mean, doesn't it at least raise a factual question? Well, in a contract case, we have to start with the question, what was the obligation under the contract? Now, protege had a good claim here against ZMedica, whether it's under the trade secret statute or under the NDA itself through a parent agency or ratification or estoppel or some other kind of theory, because no one... ZMedica was on that phone call and no one from ZMedical corrected the misimpression, as they say, it was a misimpression, that they were bound by an NDA. They acquiesced to the application of the NDA. Now, protege did sue ZMedica. And it was allowed to proceed with its claim that ZMedica had a claim. Now, protege initially had trouble pleading a claim under the NDA, but Judge Thunheim... But doesn't they... I'm still hung up. Don't they still at least have a claim against Smith for sending the email? Smith didn't send the email. Who sent the email? Another employee of Duff. Okay. And so why isn't Duff bound by the statements that they make that are not factually true? First of all, again... Now, why doesn't it at least create a question of fact? I mean, that's my real question. I mean, I'm looking at 12 v. 6, and I'm having a hard time as a person who sat on like a zillion trials in my lifetime looking at, like, they haven't at least gotten to the point where they can do discovery, right? I mean, I get to where you, at the end of the day, you can, you know, summary judgment might be a very high mountain to climb, but don't they at least get to do discovery? Before you have a fact question, you have to have a cause of action. So what's the cause of action here? This was a contract case. Well, it may be a contract case, right? It may be a professional negligence case. So there was a professional negligence claim that was originally pleaded here, and it's been abandoned. It's not mentioned anywhere in the briefs on appeal. It's... And what's the professional negligence? I mean, this is a case where we have a contract... Well, you've been hired to represent somebody in a process, and you make a factual representation that may or may not be true, and you've held yourself out as a person in having expertise, right? And you've assumed some duty at some point when you say, yeah, we're going to get these NDAs signed, and now we've got them signed, and they're not signed. I mean, when you make those kind of statements, aren't you assuming some sort of professional duty? So this brings us to the exculpation clause in this contract. The exculpation clause specifically rules out claims based on negligence. Yeah. And, you know, are we sure this isn't gross negligence? Isn't that a fact question at some point that, once again, they have the right to do discovery on? At some point, you have to look at the allegations in the complaint to decide whether they plausibly allege gross negligence. You know, the courts have made very clear that gross negligence in New York requires, quote, outrageous acts of folly, close quote. Here, there was a belief shared by both the non-lawyers at Duff and the non-lawyers at Protege that someone who was with DW Healthcare was speaking for ZMedica. That was a belief that we shared. It's a belief that was quite reasonable under the circumstances, and particularly when you got to the point on that phone call where Protege said, we're all under an NDA, and ZMedica's corporate development officer was on that call and ZMedica's chief operating officer was on that call. And, by the way, Schillinger, who signed the agreement, he wasn't a stranger to ZMedica. He was a member of ZMedica's board, and he was a managing director of DW Healthcare, which is the private equity firm that owns ZMedica. And, again, everyone knew that the company was going to be ZMedica, not DW Healthcare. So the only thing that is wrong, arguably, with that NDA is that there's a line that says buyer, and the line wasn't filled in. That's it. There's no allegation in this case that anybody thought DW Healthcare was going to be the buyer. The whole point of this conversation was that ZMedica was going to be the buyer. And what that line did was identify who the buyer was. We all knew who the buyer was. Well, somehow it seemed to allow ZMedica to at least arguably claim they escaped. It did allow ZMedica to argue that the claim wasn't adequately pled on the first try. But ZMedica, Protege, in that case, and obviously, I don't know if it was the same lawyers or not, but they never argued ratification. They did not argue that in that conversation, ZMedica's officers acquiesced to be represented by Schillinger in that NDA. And instead of making that effort, instead of going forward and taking the opportunity to replead, what they did is just settle the case. If that settlement was inadequate, that's enough in Phillips. Again, before you get to a question of whether there's a question of fact, there has to be a cause of action. So what's the cause of action? It's not breach of contract. There was no contractual obligation to get a legally binding NDA in place or to give advice about that NDA. So it's not a contract claim. There is no such claim as grossly negligent performance of a contract, right? So the only reason those cases, the Capasso case that my friend mentioned was talking about gross negligence is because it had an exculpatory clause like we have in our case. You still have to plead there was a breach of the contract. Okay. So we don't have a cause of action based on breach of contract. So what is the cause of action? Well, they've argued breach of fiduciary duty. There's a clause in the contract that precludes breach of fiduciary duty. They've argued unauthorized practice of law, but no one asked for legal advice, and it wouldn't have been reasonable to rely on a non-lawyer to give legal advice. And there was a professional negligence claim that has been abandoned. But even if it wasn't abandoned, all we're talking about here is the — there's still a clause in the contract that says there's no claim unless it's gross negligence. If you look at that indemnification clause, it says that the only basis for recovery, there's two things, either a breach by Duff or gross negligence, gross negligent conduct. Now that's, again, an exculpatory clause. You still need a cause of action, and it would still have to be grossly negligent breach, and there's no breach. So we don't get past a 12b6 motion because there's no cause of action. What about the principal agent theory, the breach of the principal agent? Is that taken care of by the fiduciary — no fiduciary duty clause, or what's your view on that? It is because, Your Honor, there isn't such a thing as breach of agency. It's breach of fiduciary duty where a fiduciary duty exists. To say breach of agency is really no different than saying breach of contract. To the extent there was an agency relationship here, it is entirely defined by the terms of the contract and what Duff did or didn't agree to do for protege. So those claims, too, point us directly back at the contract, and the claims fail for the same reasons that the breach of contract claim fails. Now, counsel mentioned another — a number of other provisions. Let me start with the complaint that was before Judge Tunheim. The complaint that was before Judge — and I make these comments just to underscore the fact that this contract doesn't allow, and the contract claim pleaded in the case doesn't allow any basis for recovery. The complaint here alleged a breach of paragraph 9 of the engagement agreement. Paragraph 9 of the engagement agreement required Duff to not disclose confidential information and to keep the information it had confidential. It didn't require Duff to stop protege from disclosing information, and it didn't require Duff to get an NDA and make sure it was legally binding before protege spoke. So that was the claim that was alleged in the complaint before Judge Tunheim. That the — 1E, the one that counsel said today, is the most important one of all. None of those provisions were mentioned at all in the complaint before Judge Tunheim. There was a First Amendment complaint, and that complaint included a claim based on 1C, which I mentioned before. That's the provision that required Duff to get an NDA to protect its own disclosure of the confidential information memorandum. And the First Amendment complaint also mentioned these other provisions and said that they implicitly required the same. But the magistrate judge denied leave to file that complaint, and the plaintiffs did not appeal that denial to the district court. So this court has no appellate jurisdiction to consider the First Amendment complaint. And in any event, for the reasons I explained earlier, none of those provisions creates the broad duty that plaintiffs are arguing for anyway. Again, this complaint mentioned an NDA only one time — I'm sorry, the contract mentioned an NDA only one time in paragraph 1C, and only in the context of Duff's own disclosure of a confidential information memorandum. So this is a case — I have some reference, and I don't remember the paragraph, of Duff and Phelps coordinating the disclosure. What do you make of that? So, again, that's in paragraph 1I, and that's a paragraph that was not mentioned in the complaint that was before Judge Tunheim. It was only mentioned in the complaint that was before the magistrate judge, and that was not appealed to Judge Tunheim. So it's not before this court. But in any event, even the amended complaint didn't plead that it's customary for a financial services advisor, the financial advisor, to be responsible for ensuring that an NDA is legally binding, or to give advice about that. There was — I heard a couple of times this morning that Protégé was at Duff's mercy about this NDA. Well, there was nothing stopping Protégé and its lawyers who were present in this — in connection with this NDA question to ask for the NDA. There was nothing stopping them upon receiving an e-mail from an employee, a non-lawyer at Duff, which said, we have assigned NDA by DW Healthcare slash ZMedica, from saying, really? Huh. I'm confused. Is it both, or is it one? And there was nothing stopping Protégé from asking for that NDA. They didn't. What they did instead is take responsibility for the situation themselves by saying on that phone call, we're all under an NDA before proceeding to disclose any information. That gives rise to a claim against ZMedica. Protégé chose to settle that claim instead of repleting it under a different theory, whether it's ratification or estoppel or something else. And if that settlement was inadequate, that is not a claim against Duff and Phelps. With that, we would ask that the dismissal be affirmed. Thank you. Thank you. Well, I left myself 54 seconds. Paragraph 1E, which was appendix C, 69 through 75, the entire engagement agreement was attached to the complaint. We talked in the complaint about HEATH, which sets the standard for what's customary. And 1E says that DP will provide the company with the following services. Participate in due diligence visits, which would be both the two occasions we talk about. Meetings, consultations between the company and seriously interested potential purchasers. And coordinate distribution of all information related to the transaction with Dutch parties. In other words, they were responsible. We didn't know who the potential purchasers were. We were told who they were, and when we could disclose information, they were in charge. We were not in charge. That is absolutely clear. The Valoran case gets rid of this whole issue about exculpatory clauses and disclaimers. And specifically, it was a massive case against Morgan Stanley, dispensably rejects what Dutch Thunheim said with regard to disclaimers. They do not apply if the structure, according to the highest court of New York, EBC, if the structure creates an agency, there's an agency, regardless of the disclaimer. Thank you very much. The case is submitted, and we will issue an opinion in due course.